## Frankfort & Cincinnati Railway Co., et al. v. Jackson.

### (Decided May 6, 1913.)

### Appeal from Scott Circuit Court.

1. Contracts—Statute of Frauds.—A verbal contract to continue as long as one of the parties remains in business, is not within the Statute of Frauds providing that "no action shall be brought upon an agreement not to be performed within one year unless it is in writing," as such a contract may be performed within a year.

2. Damages—Measure of in Cases Where There is a Breach of a Contract That Is Incidental to a Business Enterprise.—Where a common carrier agreed that it would deliver coal to a coal elevator and afterwards broke its contract, the owner of the elevator was only entitled to recover in damages the loss he sustained in the income from his business caused by the breach. He could not recover for any impairment in the market value of the property.

3. Damages—Limitation as to Assessment of in Cases Where Contract is Indefinite as to Time.—Where the contract does not fix any time limit but is to continue at the option of one of the parties, the party at whose option the contract may be abandoned, in a suit for damages against the other party for failure to perform his part, can only recover such damages as he sustained from the date of the breach to the time of the trial, but if the breach continues, may bring a subsequent action.

4. Contracts—Mutual Covenants—Duty of Each to Perform—Liability for Failure.—Where a contract provides that each of the parties shall perform certain conditions and both of the parties express a willingness to do their part but neither of them does anything, and the contract cannot be carried out until both of them have performed their part, in a suit by one of the parties against the other for a breach, the complaining party is only entitled to recover such damage as he sustained less what it would cost him to perform his part of the contract, to the end that it might be carried out.

BENJ. D. WARFIELD, EMMETT M. DICKSON for appellants.

BRADLEY & BRADLEY for appellee.

Opinion of the Court by Judge Carroll—Reversing.

On December 27, 1902, the appellee, J. P. Jackson and the Frankfort & Cincinnati Railway Company, hereafter called the F. & C., entered into a written contract by the terms of which the F. & C. agreed to deliver coal at an elevator previously erected and owned by Jackson in the city of Georgetown. The contract stipulated that,

"The said Jackson agrees to provide a suitable approach from the track of said company to the elevator in accordance with the plans of said company's engineer and submitted to the General Superintendent of said company, said Jackson furnishing all necessary material and labor for the construction of said approach at his own expense.

"After said approach is built the said company agrees that it will furnish at its own expense the necessary switch and turnout fixtures and rails and lay the track on the approach to and on the elevator. * * *

"Upon completion of the approach and when the same is ready for use, the said company agrees to place on the elevator such cars of coal as may be shipped over its line of railway to said J. P. Jackson for unloading in said elevator without cost to said Jackson and it agrees to place on said elevator cars shipped over other railroads to said J. P. Jackson without extra charge except the usual switch charges for switching other cars received from other roads on its own switches.

"In consideration of the facilities so afforded it for unloading cars, the said company agrees to pay to said Jackson half of the cost to him of the material and labor expended by him in the construction of the said approach from its track to said elevator, said repayment to be at the rate of 15 cents per ton of coal handled over the Frankfort and Cincinnati Railway Company from Paris or Frankfort and consigned to said Jackson and unloaded on said elevator. * * * When the amount so proposed to be refunded by the said company shall have been paid to said Jackson, the structure and material composing same, located on the right of way of said company, shall become and remain the property of said company, and shall be maintained at its cost and expense, but until that time it shall be maintained by said Jackson.

"It is agreed that the rails and fastenings on the entire structure, being furnished by said company, shall

be and remain its property and shall be maintained by it
\* \* \*

"It is further agreed by the parties hereto that this contract and license given herein shall continue for a period of five years with. the privilege of renewing the same upon such terms as the parties may agree on."

This contract was carried out in a manner satisfactory to both parties during the five years of its existence, and at the expiration of the five years it was renewed, as claimed by Jackson, under a verbal contract entered into between him and Harper, president of the F. & C. In respect to this renewal, Jackson testified that the agreement was that the terms and conditions of the written contract—except so much as related to the repayment to him by the F. & C. of one-half of the cost, which had been satisfied—should continue in force as long as he continued in business and would handle coal at his elevator that came over the line of the F. & C.

Harper testified in substance that, in the conversation he and Jackson had respecting the renewal of the contract, he told him "we will just go on and continue business in the same way," and also that "as long as he was in business there we would continue to set up those cars as we had done before." It is further shown without contradiction that from the expiration of the written contract in December, 1907, until November, 1909, both the parties transacted business in the same manner as they did under the written contract and we may therefore say at this point that when the written contract expired it was verbally agreed between Harper and Jackson that the terms and conditions of the written contract, with the exception noted, should continue in force as long as Jackson remained in the coal business and handled coal in the manner contemplated by the written contract.

In November, 1909, the F. & C. sold and conveyed its property to the Louisville & Nashville Railroad Company, hereafter called the L. & N., and by the terms of this contract of sale and purchase the L. & N. assumed all existing contracts of the F. & C. as well as all existing liabilities incurred by it. Very soon after the L. & N. obtained possession of the tracks and property of the F. & C. a controversy arose between the L. & N. and Jackson as to the rights and liabilities of the parties under this contract, with the result that the L. & N. refused to deliver coal at Jackson's elevator. The causes

that brought about this controversy will be stated more at length later on.

In 1911 Jackson brought this suit against the F. & C. and the L. & N. to recover damages for a breach of the verbal contract entered into between himself and Harper. He averred in his petition that at the expiration of the written contract "it was mutually agreed and understood between the plaintiff and the said defendant, F. & C., that said contract was renewed according to its terms for another period of five years, and the plaintiff agreed to handle its coal over the road of said defendant when it could be so obtained;" and that under this verbal contract both parties continued to act as they had under the written contract until November 1, 1909, when the L. & N. under its purchase took control and charge of the F. & C.

He further averred that the L. & N., after its purchase, performed the contract until December, 1909, when it refused to deliver coal to the elevator upon the ground that the approach was unsafe and dangerous and that by this breach of its contract the fair market value of his property was diminished in the sum of $2,175 and his business damaged in the sum of $5,000.

After making various motions and demurrers, the L. & N., for answer to the petition, denied that there had been any renewal of the written contract between Jackson and the F. & C., and affirmatively averred that the elevator and approaches to the same, except so much of the approach as was constructed upon the right of way of the F. & C., and excepting the rails and fastenings on the structure, were the property of Jackson, and it was his duty and obligation under the contract to keep that part of the approach owned by him in repair, which he failed to do, and, by reason of this failure, his part of the approach had become unsafe and dangerous for use by engines and cars, and engines and cars could not be transported over the approach without great danger to life and property, and for this reason, as well as because the written contract had never been renewed, or, if renewed, was void for uncertainty, and also lacking in mutuality without consideration, as well as within the Statute of Frauds, it refused to deliver cars of coal to the elevator.

In reply Jackson, while admitting that he was the owner of the elevator and approach thereto, except that part located on the right of way of the F. & C., and under

a duty to keep the same in repair, except as to the rails and iron fixtures, denied that the structure or any part of it owned by him was out of repair or that for this reason the L. & N. refused to deliver cars over it. He further averred that if any repairs were necessary on his part of the structure "He was at all times ready and willing and able to make said necessary repairs thereon but that the L. & N. made no claims that repairs were necessary, and did not assign this as a reason for refusing to deliver coal until long after it had broken its contract."

After the pleadings had been made up, there was a trial of the case before a jury and a verdict for Jackson in the sum of $1,675, and from the judgment on this verdict, this appeal is prosecuted.

It is earnestly insisted by counsel for appellant that the petition was fatally defective in that it stated that the verbal contract should continue for a period of five years, and so was in violation of that section of the Statute of Frauds providing that "no action shall be brought to charge any person  *   *   *   upon any agreement which is not to be performed within one year from the making thereof unless the promise, contract or agreement * * * or some memorandum or note thereof be in writing and signd by the party to be charged therewith, or by his authorized agent."

If the case were here on the demurrer to the petition as amended alone we would say that it attempted to state a cause of action within the section of the Statute of Frauds quoted, and was therefore non-enforceable; but we think the other pleadings and issues in the case cured this defect, and, as the judgment must be reversed for other reasons, it does not seem necessary to further notice this objection.

Although as before stated the petition relied on a renewal contract that was prohibited by the Statute of Frauds, and therefore not enforceable, the contract really made between Jackson and Harper, as testified to by both of them, was not within the Statute of Frauds, as it only provided that the contract should continue in existence as long as Jackson remained in business and therefore might have been performed within a year. Stowers v. Hollis, 83 Ky., 544; Howard v. Burgen, 4 Dana, 137; Dickey v. Dickinson, 105 Ky., 748; Fain v. Turner, 96 Ky., 634.

Nor do we think the renewal contract was void for uncertainty, lack of mutuality, or want of consideration. The written contract was not deficient in either of these respects, and as the verbal contract merely continued in force the written contract, all the provisions of the written contract are to be treated as a part of the verbal renewal contract.

Passing what we may call the preliminary legal questions raised by counsel, and coming to what we conceive to be the real issues in the case, we will consider the rights and liabilities of the parties under the renewal contract, the questions relating to the unsafe and dangerous condition of the structure, the duty and obligation of the parties in respect thereto, and the measure of damage Jackson was entitled to recover if the L. & N. committed a breach of the contract.

It is agreed that about one-half of the approach to the elevator, and over which cars had to be carried from the railroad to the elevator, was located on the right of way of the F. & C., and that the other part of it was on the ground owned or acquired by Jackson, and that it was the duty of the L. & N. to maintain and keep in repair that part of the structure on its right of way and the duty of Jackson to maintain and keep in repair the remainder of the structure; and that it was the further duty of the L. & N. to maintain and keep in repair on the entire structure the rails and iron fixtures attached thereto.

The evidence shows that the coal elevator was built before the approach or trestle connecting it with the F. & C., and that the approach was built to better facilitate the delivery of coal to the elevator, although it was not indispensable to the use of the elevator for the purpose intended, and that the approach was about five hundred feet long, and in some places several feet high. It is also shown that soon after the L. & N. purchased the F. & C., and before or about Jan. 1, 1910, the L. & N. delivered its first car of coal at the elevator in the same manner as the F. & C. had been doing, but the trainmen complained of the unsafe and dangerous condition of the approach, and thereupon the L. & N. declined to put any engines or cars on it until it was repaired and made safe for their carriage.

Within a short time after this, some engineers and bridge inspectors for the L. & N. examined the approach carefully, and they and many other witnesses qualified

to speak on the subject testified that the approach was in such condition as that it would be dangerous to life and property to attempt to haul engines and cars over it, and these engineers estimated that it would cost to put Jackson's part of the approach in safe condition and good repair something over one thousand dollars, and about the same amount to put in good condition and repair that part of the approach owned by the L. & N.

Jackson, who was at once notified of the estimates that had been made, testifies that he was able, ready and willing to make the repairs on his part of the structure, but the evidence does not show that he made any effort of any kind looking towards making the repair after he was informed what it would cost; nor did the L. & N. make any repairs on its part of the structure, although its officers testify that it was also willing, ready and able to put in repair the part owned by it.    Neither party having made any repairs, no coal was delivered over the approach to the elevator after the one car that has been mentioned.

It is also in evidence that in January, 1910, and before the L. & N. had declined to deliver any cars over the approach, or at any rate before it was known that it had refused to do so, Jackson sold his elevator property, including his part of the approach, for $4,500, and retired from the coal business; but the purchaser, upon learning that the L. & N. would not deliver coal to the elevator, declined to take the property, and when it was again offered for public sale sometime in the spring, 1910, it only brought $2,825.  The evidence further shows that this difference in the price was caused by the refusal of the L. & N. to deliver coal to the elevator, and that the last purchaser at once took down the part of the approach he had bought and that the L. & N. took down its part.

After the evidence was in, the court instructed the jury in substance that if they believed that Jackson and Harper agreed to continue the written contract in force as long as Jackson remained in business and got his coal over the F. & C., and that the L. & N. repudiated this agreement and refused to carry out its terms, and they further believed that Jackson was ready, able and willing to carry out his part of said agreement, then they should find him the damages he sustained by reason of such failure, not exceeding $2,175, as damage to his property, and not exceeding $5,000 as damage to his

business, and that the measure of damage to which Jackson was entitled in the event the jury found for him was "the depreciation, if any, in the fair market value of said real estate, caused by defendant's failure to carry out the said agreement, if there was such an agreement; and the measure of damages to the business is the depreciation in the net income of said business, if any, caused by defendant's failure to carry out said agreement."

Counsel for the L. & N. asked the court to instruct the jury in substance that the L. & N. had the right to refuse to deliver cars to the elevator until it was put in a safe condition for use, but the court refused to give any instructions on the subject of repairs or any instructions except those we have indicated.

It will be observed that the contract relied on was in effect and indeed in terms that the F. & C. would continue in effect the written contract as long as Jackson remained in the coal business and continued to get coal over the F. & C., and that no time was fixed when the renewal contract should expire, it being optional with Jackson to continue it in force as long as he remained in the coal business and received his coal over the F. & C.

It will also be observed that the renewal contract did not provide that it should remain in force as long as the coal business was carried on at this elevator by persons who were willing to get their coal over the F. & C., or that Jackson might sell or assign his rights under it. We, therefore, think the renewal contract was a personal contract with Jackson to be continued as long as he remained in business and received his coal over the F. & C., and that, when he ceased to do business, the contract ended. It was neither the subject of sale nor assignment, nor did it run with the property.

Assuming now that this contract was broken by the L. & N., and passing for the moment the subject of repairs, the question presented is, what was the measure of damage to which Jackson was entitled? In our opinion, Jackson, under this contract, was not entitled to recover anything for the depreciation in the market value of his property by reason of the failure of the L. & N. to deliver coal at his elevator. The measure of his damage was limited to the depreciation or loss in the net income derived from his business, caused by the failure of the L. & N. to carry out the agreement.

As before stated, the contract had no fixed time to run. It could be terminated at any time by Jackson. It

was entirely voluntary with him whether he continued in the coal business a day of a year, and manifestly it would be unfair to allow him to recover for the permanent depreciation in the market value of his property when he might, the day after the judgment was rendered, conclude to abandon the coal business entirely. If he did this, as he might have done and had the right to do, the result would be that the L. & N. would be required to compensate him for the permanent depreciation in the value of his property, although by his abandonment of the coal business he had forfeited his right to secure any damages for loss thereafter occurring.

This case furnishes an apt and striking illustration why the complaining party in a case like this should not be allowed to recover damages for any depreciation in the value of his property. Here, long before the suit was brought, Jackson voluntarily abandoned the coal business, and thereby ceased to have any rights growing out of the contract, or any right to recover damages for its breach, and yet, under the instructions of the court, he was allowed compensation for the depreciation in the value of his property for all time to come.

In support of the view that the instruction was correct, we are referred to the cases of Yellow Poplar Lumber Co. v. Rule, 106 Ky., 455; and Kelly v. Peter & Burghard Stone Co., 130 Ky., 530, and Louisville & Nashville R. R. Co. v. Cox, 145 Ky., 667.

In these cases it was held that where an employer, for a valuable consideration entered into a contract with an employe to give him employment at a specified compensation for a period of time not fixed in the contract, and therefore we might say an indefinite period of time, the employe might in one suit recover all the damages to which he was entitled, although the damages beyond the date of the trial were of course a most uncertain quantity.

We have also been referred to the case of Bridgeford & Co. v. Meagher, 144 Ky., 479, holding that where an employe made a contract for a definite period with his employer that he might recover damages for a breach of the contract by the employer covering the whole period of the contract of employment, although the suit was brought and the trial had before the expiration of the contract period.

But those cases—and there are many others like them —are not applicable to the case before us. In suits like

the ones we have referred to the breach of the contract involved and destroyed everything out of which the transaction between the parties arose. There was nothing left of the thing that was the basis of the contract; but here the contract between Jackson and the F. & C. was a mere incident to his business and did not involve the whole of it. True it may have been a material and important part of his business, but nevertheless the handling of coal over the approach was merely a facilitating incident in connection with his business. In other words, the failure of the L. & N. to carry out the contract did not destroy the coal business of Jackson; it only impaired its value. Notwithstanding the failure to deliver cars over the approach, he might yet have carried on his business; and so the injury by the breach of contract was to his business and not to his property.

This view is well expressed in the case of the Union Pacific Railway Company v. Travelers' Insurance Company., decided by the Federal Circuit Court of Appeals for the Eighth District, and reported in 83 Fed. Rep., 676. In that case a hotel was built on the line of railway under an agreement with the railway company that it would stop passenger trains at the hotel for meals. The railroad company, after complying with this contract for sometime, refused to stop its trains at the hotel, and the proprietor brought suit against the railway company for damages, and was awarded by the lower court the depreciation in the market value of his property for hotel purposes, which the court found to be the entire cost of the property. On appeal to the Circuit Court of Appeals that court ruled that the measure of damage to which the hotel man was entitled was the diminution in the earnings of the hotel, caused by the railway company's breach of contract, between the time of the breach and the bringing of the suit. In distinguishing the case from that class of cases like the Yellow Poplar Lumber Company and Peter Burghard Stone Co., cases, the court said:

"They are cases in which the covenants upon which they were brought went to the whole consideration of the contract; cases in which the failure to perform the covenants in suit deprived the plaintiffs of the chief or the entire value of the contracts, and rendered their further existence useless to them. Thus the entire consideration for an agreement to pay for personal services is the covenant to devote the skill and ability of the employed

to the service; the whole consideration for the convey-
ance of a farm for the support of the grantor is the cove-
nant of the grantee to furnish that support; the entire
consideration for the performance of a contract of grad-
ing, which is to be paid for in money, is the promise to
pay money; and the real consideration for the erection
and maintenance of the elevator at Dubuque was the
covenant of the railroad company to furnish grain for it
to handle, and to pay for its handling.

''Perhaps we have examined this class of cases with
sufficient care, and we turn to a consideration of cases
involving the breach of independent covenants which do
not go to the whole consideration of the contract, but are
subordinate and incidental to its main purpose. The rem-
edy for the breach of such covenants is compensatory
damages for the profits lost or the injuries sustained
during the continuation of the breach prior to the com-
mencement of the action. It does not avoid or put an
end to the contract, nor does it authorize the recovery of
damages for its total breach.''

Another instructive case is that of Obermeyer v.
Nichols, 6 Bin. (Pa.) 159. In that case Nichols had
leased a mill to Obermeyer for four years, and cove-
nanted in the lease to build a house adjoining the mill
and to make certain improvements after the commence-
ment of the term. The tenant took possession and the
lessor broke his covenants. In holding that the measure
of damage to which the tenant was entitled was the dim-
inution in the rents and not the total rent, the court said:

''I entirely agree with the charge of the court below,
that the defendant in that suit, having enjoyed the mill
and premises demised, the covenants on the part of the
landlord were minor and subordinate, and did not go to
the essence of the contract, so as to defeat the rent in
toto, in case they were not performed; but that the jury
were at liberty to defalk in damages from the rent what-
ever they might think just and conscientious for the re-
pairs neglected to have been made. Where a covenant
goes only to part of the consideration on both sides, and
a breach of such covenant may be paid for in damages,
it is an independent covenant.''

We regard the rule announced in these cases as sound
when applied to the facts of this case, and therefore hold
that Jackson was not entitled to anything for the di-
minution in the market value of his property.

The next question that suggests itself is, for what length of time should Jackson be allowed to recover damages for loss sustained to his business. The instructions did not fix any time during which Jackson should be compensated for his business loss, but left it to the jury to give him damages on this account for an unlimited and indefinite period of time. This was error, under a contract like this that might, as we have said, be voluntarily abandoned by Jackson at any time, he should not have the right to recover damages for an estimated business loss that he might never be entitled to. Or, to state it differently, under the instructions the jury might have awarded Jackson damages for the depreciation in the net income of his business for five or ten years, or, indeed, any length of time in their discretion, although Jackson may have voluntarily retired from the business within a month after the verdict was returned; and, in fact, he did voluntarily sell his property and retire from the business before this suit was brought.

We think that the jury should have been instructed that they could only allow Jackson the damage he sustained by the depreciation in the net income derived from his business up to the time he disposed of his property. This question was so ruled in Keith v. Hinkston, 9 Bush, 283. That case, like this, was a suit to recover damages for the failure to keep a switch in repair and furnish cars for the transportation of freight, and the court said:

"Appellee alleges that appellants 'promised and agreed to keep said switch or spur in good repair, and that they would when requested' furnish cars and transport the stock, products and commodities of Hinkston to market, etc. The breach of this undertaking is charged to be the removal of the switch, and the refusal by appellants to make any provision for the transportation of appellee's stock, commodities, etc.

"It is evident that the damages sustained, if any, result, not from the removal of the switch, but from the failure to replace it at proper times to accommodate Hinkston in the shipment to market of his stock, etc. The failure of appellants to keep this agreement up to the trial of this action does not entitle Hinkston to recover for like failures for all time to come.

"Appellants may, as they will have the undoubted right to do in case the alleged contract is sustained, replace the switch and afford Hinkston the accommodation to which he claims to be entitled.

"Besides this, while the damages for past breaches may be ascertained with a reasonable degree of certainty, it is absolutely impossible to form any estimate whatever as to what they will be in the future, and this of itself is a sufficient reason to restrict the recovery as heretofore indicated."

Turning now to the question of repairs, the contract in this respect was a mutual one; each of the parties was obliged to make the repairs described in the contract, and of course the L. & N. had the right to decline to risk life and property in hauling cars over this approach until such repairs had been made as would put it in safe condition for engines and cars. Both of the parties declared that they were able, ready and willing to make the repairs that each had to make, but neither of them did anything. The repair by either of his part, unless the entire structure was repaired, would have accomplished nothing, and so it was the duty of each of the parties to have made the repairs according to the contract.

We have, then, this state of case: Jackson says, "I didn't do anything towards repairing my part of the trestle because the L. & N. did not do anything towards repairing its part," and the L. & N. says, "We didn't repair our part because Jackson didn't repair his." Now what are the rights of the parties? We think that Jackson as the complaining party should in some tangible, substantial way have manifested his willingness and readiness to repair his part of the trestle; but, as stated, the evidence shows that, after learning what the cost would be, he took no action whatever looking towards the repair of his part. But passing this difficulty in the way of Jackson and assuming that Jackson was able, ready and willing to perform his part of the contract, and that the fault was with the L. & N., it seems quite clear that from any recovery by Jackson on account of the delinquency of the L. & N., there should be deducted the amount it would cost to put his part of the trestle in sufficient repair.

The L. & N. could not, and was under no duty whatever to haul or attempt to haul cars over the trestle until it was so repaired as to make it safe, and certainly Jackson should not be allowed to recover the amount of loss he suffered without being required to account for what it would cost him to put the trestle in repair so that the contract might be carried out. If Jackson's part of the approach was unsafe or dangerous for use by engines

and cars, and Jackson should be allowed to recover damage for the failure of the L. & N. to transport the cars, he would then be compelling the L. & N. to pay damages for a condition that he had created and failed and refused to remedy; but if there is deducted from any damage he may recover the sum that it would have cost him to put his part of the approach in repair, he will receive exactly the amount that he would have received if he had complied with his contract by making the repairs, and the L. & N. will be required to pay him the amount of damage he sustained by its failure to repair its part of the trestle.

To sum up our conclusion, we hold (1) that Jackson was not entitled to recover anything on account of the depreciation in the market value of his property; (2) that his recovery for the depreciation in the value of the income from his business, caused by the failure of the L. & N. to deliver coal, should be limited to the loss he sustained from the date of the breach up to the time he sold the property and went out of the coal business; (3) if the jury find for Jackson anything on account of this loss, there should be deducted from it whatever sum the jury may find it would have cost Jackson to put his part of the approach in such condition as would make it safe for the transportation of engines and cars.

The judgment is reversed for a new trial on principles consistent with this opinion.