Leland M. **MAHAN**, trading and doing business as Underwriters Safety & Claims, Plaintiff,

v.

**KENNETH B. S. ROBERTSON, LIMITED**, a Corporation, Defendant (two cases).

Civ. A. Nos. 2108, 2109.

United States District Court
W. D. Kentucky, at Louisville.
Aug. 11, 1955.

46. U. S. ex rel. Darcy v. Handy, 224 F.2d 504.

John P. Sandidge, Woodward, Hobson & Fulton, Louisville, Ky., for plaintiff.

Malcolm Y. Marshall, Ogden, Galphin & Abell, Louisville, Ky., Maxwell P. Barret, Reeves & Barret, Hazard, Ky., for defendant.

SHELBOURNE, Chief Judge.

Civil Actions numbers 2108 and 2109 were each filed in the Jefferson Circuit Court April 11, 1951. Each was removed to this Court on the ground of diversity of citizenship, the requisite jurisdictional amount being involved in each.

Civil Action No. 2108 alleged that in the month of October 1943, the defendant corporation and plaintiff Mahan entered into an oral contract whereby the plaintiff Mahan, trading and doing business as "Underwriters Safety & Claims" agreed to spend the time and money nec-essary to create an organization to develop Workmen's Compensation insurance coverage of a type known in the business as "excess aggregate", to be brokeraged through the defendant company; that the defendant agreed in consideration of said plaintiff doing the things herein set out, to use this plaintiff as exclusive representative for all business in Kentucky of the type developed by the plaintiff; that plaintiff would be paid a sum equal to eleven percent of the normal premiums on all business so developed by the plaintiff or developed by brokers appointed by plaintiff, "or appointed in Kentucky by the defendant for writing or developing the business of the type herein described."

Plaintiff alleges that he performed all the undertakings of the contract on his part and that by February 1, 1949, he had developed and placed through the firm of defendant, insurance business having a normal premium of $400,000; that on February 1, 1949, without any notice to the plaintiff, the defendant, "through its duly authorized agents, acting within the furtherance of the business of the defendant, made a contrary and conflicting contract with two residents of Kentucky, to-wit, Dewey Daniel and Merlin B. Fields, whereby the parties thereto agreed to and thereafter did, appropriate for their benefit the business, profits, fees, and emoluments to which this plaintiff was entitled under the contract aforesaid."

It is alleged that as a result of a conspiracy between defendant corporation, Dewey Daniel and Merlin B. Fields, all of the files, records, papers and documents belonging to the plaintiff were wrongfully taken from plaintiff's office in Hazard, Kentucky, and thereby terminated the contract between plaintiff and defendant to plaintiff's damage in the alleged amount of $90,000, which amount he sought to recover from the defendant.

Action No. 2109 was a petition in equity, in which substantially the same allegations were made as were contained in Action No. 2108. The prayer of this pe-

tition was for an accounting, it having been alleged that the defendant had wrongfully failed to account for fees and commissions due the plaintiff and that plaintiff had been unable to obtain from the defendant an accounting of the sums due him as of February 1, 1949, but alleged that it was at least a sum in excess of $8,000. The defendant admitted having in its possession $686 due plaintiff.

Following the removal, a motion to dismiss was filed in each action, in which the grounds for dismissal were set forth as—

1. Lack of jurisdiction in this Court over the person of the defendant, or in lieu thereof, to quash the return of service of summons on the ground that (a) the defendant is a corporation organized under the laws of the Dominion of Canada and was not subject to service of process in the State of Kentucky, and (b) defendant had not been properly served with process. 2. The action was improperly brought in the Jefferson Circuit Court in Jefferson County, Kentucky, where the venue of the action was not properly laid, because (i) defendant did not have an office or place of business in Kentucky, or a chief officer or agent residing therein, (ii) defendant does not and did not have, an office or place of business situated in Jefferson County, Kentucky, (iii) defendant did not have a chief officer or agent of any officer residing in Jefferson County, (iv) defendant did not make any contract in that County and (v) defendant did not make any contract to be performed in Jefferson County, and for the further alleged reason that defendant did not reside in Jefferson County nor was defendant summoned in that County.

There was appended to this motion, the affidavits of Kenneth B. S. Robertson and George F. Wilson, stating in great detail facts in support of the allegations of the motion to dismiss. These affidavits were controverted by counter-affidavits of the plaintiff Leland Mahan and Mark V. Marlowe.

A decision on the motion to dismiss and upon the motion to quash the return of the summons was reserved and deferred until the trial of the action on the merits, there being sharp issue in the affidavits.

Answers were filed, denying the allegations of the petitions and the cases were consolidated for trial and tried to the Court without a jury March 2, 3, 4, and 5, 1953.

Plaintiff Leland M. Mahan died May 23, 1953, and in November thereafter, Lois W. Mahan, his Executrix under the will of Leland M. Mahan, moved the Court for an order substituting her as Executrix of her husband's estate, as plaintiff in the actions and such order was entered November 20, 1953; following which, extensive briefs were filed by Counsel for the respective parties.

The transcript of the evidence contains 473 pages, exclusive of many exhibits. Plaintiff's original brief contained 44 pages, and defendant's brief 142 pages and each filed a reply and supplemental brief.

Leland M. Mahan was forty-one years of age at the time of his death in 1953. He was licensed to practice law in 1935 and devoted the greater part of his time and effort to the field of Workmen's Compensation law, KRS 342.001 et seq. He became interested in a type of compensation coverage called aggregate excess, and having learned that an approved service company was necessary before that type of business could be written, in 1937, he organized and in 1941, had approved the Underwriters Safety & Claims and under this name, he operated. He describes a Service Company as "almost all the departments that you think of an insurance company having."

The Service Company inspects the risks as to the hazards involved, obtains information necessary for the rating, supervises the brokers, so that any quotations they make will likely be approved by Lloyds of London and after the risk is written, handle all of the claims and do a monthly engineering service and in the event claims arise and are not settled, to handle the resulting litigation.

"So", says Mahan, "we were, in a sense, the rating department, the agency department, the claim department, the engineering department, and the legal department."

The business of Underwriters Safety & Claims was confined to coal mines largely in the eastern section of Kentucky.

Excess aggregate insurance, as applied to coal mines, required first that the insured qualify as a self insured with the Kentucky Workmen's Compensation Board. The term "excess aggregate" means the excess of the aggregate of all claims. The aggregate is determined by the terms of the policy. The normal premium is determined by finding an experience rate in accordance with the company's past experience. Multiplying that rate times the company's yearly payroll would give the normal premium. Thirty percent of this normal premium is paid by the insured and the remaining 70 percent of the normal premium is deposited to an escrow account in the coal company's name, upon which the service agent (here, Underwriters Safety & Claims) had sole authority to draw the checks in payment of the claims, under the provisions of the Kentucky Workmen's Compensation Act.

Dewey Daniel operated an insurance agency at Hazard, Kentucky. He was President of a bank in that City and had prominent connections with the operators of coal mines throughout Eastern Kentucky. He was, during the years in question here, a licensed agent for Lloyds of London.

The defendant, Kenneth B. S. Robertson, Limited, was a Canadian corporation, apparently enjoying unusual agency power with the Underwriters, Lloyds of London. This unusual power as Agent, is referred to as "open cover", which is explained as the authority to bind Lloyds to any contract without first submitting the proposed risk and obtaining specific authority. Mr. K. B. S. Robertson was President of this Canadian corporation until about 1952 when, because of impaired health, he became mentally incompetent, and a serious question arose upon the trial of this case as to whether letters written to and received from Robertson or his corporation, signed by him, were proper subjects of evidence in this case, because of Kentucky Civil Code, Section 606(2), now K.R.S. § 421.210(2) prohibiting one to testify for himself concerning transactions had with one who at the time said testimony is offered is a person of unsound mind.

Kenneth B. S. Robertson was succeeded in the presidency of the defendant corporation by George F. Wilson.

The Court, from the evidence heard at the trial, makes the following—

### Findings of Fact

1. The defendant is a corporation organized under the laws of the Dominion of Canada to do business as an insurance broker. For the purpose of this case, the defendant was engaged in the business of binding underwriters at Lloyds, London, England, upon contracts of reinsurance, self insured employers in the United States and in Kentucky.

2. The defendant was authorized by the underwriters at Lloyds, London, England, to bind them under such contracts of reinsurance by setting the rates, conditions, and termination dates on such policies. This reinsurance was known as excess aggregate workmen's compensation insurance.

3. The plaintiff, deceased since the trial of this action and represented presently by his widow as Executrix, was an individual doing business as Underwriters Safety & Claims. For the purpose of this case, the plaintiff was engaged in the business of soliciting or "producing" self insured employers for coverage under excess aggregate workmen's compensation insurance policies and in "servicing" such risks after they accepted coverage. Such servicing included the inspection of the employer's premises to determine safety and accident conditions thereon, recommendations for changes therein to induce bet-

ter accident experience, examination and adjustment of employee claims arising under the Workmen's Compensation Acts, and, if necessary, the adjudication of such claims on behalf of the employer.

4. Excess Aggregate Compensation Insurance was effectuated as follows:

(a) The "producer" of the risk quoted a tentative premium to the employer based upon an estimate of the employer's payroll for the ensuing year times a rating factor obtained through an analysis of the employer's "experience" (meaning the ratio of previous compensation paid claimants to the actual payrolls for the rating period). This premium called normal premium, was not offered to a prospective risk until the producer obtained the consent of the defendant to the rate quoted.

(b) If the employer accepted the offer of reinsurance as finally quoted, 30% of the normal premium was delivered immediately to the producer, under the 70–30 insurance plan, or, if the plan were the 75–25, then 25% of the normal premium was so delivered.

(c) From this 30% or 25%, as the case may be, was taken all of the compensation for all the parties to the transactions with which this suit is concerned, the producers, servicers, brokers, and underwriters.

(d) Since the 30% or 25% of normal premium was not capable of alteration, the "take" of each of the parties directly affected the sums available to the others for their share. During the periods here in question, the only party to the effectuation of Excess Aggregate compensation insurance who did not bargain or complain about their proportion of the premium were the underwriters of Lloyds, London, England; as to them, the share remained constant either by agreement or necessity.

(e) As to the producer, servicer and broker, there was never, during the period here in question, an agreed method of division of the remaining portions of the premium after the allowance of the portion going to the underwriters at Lloyds. But, rather, during that time, one producer responsible for the production of a large amount of excess aggregate compensation insurance, Dewey Daniel, was not even informed of the amounts being paid to the plaintiff for the servicing of such risks, while the plaintiff's share fluctuated by as much as 2% of the normal premium from risk to risk and year to year.

(f) The remaining 70% or 75% of the normal premium, depending upon the plan followed, was handled as follows,

(1) If the employer in question were solvent and its record for the prompt payment of compensation claims as a self-insurer were good, then the employer retained the entire 70% or 75% of the normal premium in whatever form it desired, state law requiring the execution of a bond insuring payment of claims, which bond was signed by the employer and countersigned by whatever licensed Kentucky agent the defendant authorized to countersign. Usually the plaintiff made this countersignature.

(2) If the employer were not solvent, or had a poor record for prompt payment of compensation claims, it was required to deposit the entire 70% or 75% of the normal premium in an escrow deposit at an agreed local bank, subject to withdrawals by the plaintiff, as the service organization making payment of claims.

(g) Under the terms of excess aggregate compensation agreements, the 70% or 75% of normal premiums was the fund from which all workmen's compensation claims would be first paid, and only upon exhaustion of such fund would the underwriters at Lloyds become liable as reinsurers. Whatever claims occurred which could not be satisfied from the 70% or 75% of normal premium were the responsibility and obligation of the underwriters. At no time did either the plaintiff or defendant have any such obligation, neither acting as insurers or reinsurers.

5. In addition to excess aggregate insurance, the plaintiff and other producers were also engaged in selling what was

called specific excess compensation insurance. These policies were also ones for reinsurance, but were designed to protect a self-insured employer from special calamities such as explosions and multiple accidents for which they would pay in excess of the amounts covered by the excess aggregate insurance. The premiums for specific excess compensation insurance were drawn from the 70% or 75% of the normal premium on excess aggregate insurance kept by the employer or bank as the case might be. This premium was 30¢ per $100 of payroll.

6. Like the 25% or 30% of the excess aggregate premium the 30¢ per $100 payroll premium on the specific excess insurance was never, during the period here in question subject to any agreed method of division among the parties to the transaction after the underwriters' share had been deducted, but rather, was a constant subject of bargaining and complaint.

7. As a method of reinsurance, excess aggregate compensation insurance appealed particularly to those coal mine operators in Kentucky with good compensation claims experience, since all of the 70% or 75% of the normal premium which was not paid out in compensation claims at the end of the policy period, re-vested in the employer clear of further charges, while in the unusual case where such a sum did not meet the claims made, the employer was protected from further expense by his reinsurance with underwriters.

8. A good experience rate, meaning a low ratio of claims paid out in relation to dollars of payroll, further rewarded employers covered by excess aggregate compensation insurance by enabling them to obtain an equivalent reinsurance coverage by underwriters at Lloyds for a smaller normal premium.

9. Underwriters at Lloyds would not write excess aggregate insurance unless there was available for employment as a service organization for the risk in question some firm approved by them for that purpose. The name of the firm so approved for the servicing of the risk in question was ordinarily inserted in the policy as the only firm by which servicing would be allowed.

10. The service organization's function was of importance to underwriters at Lloyds since the 70% or 75% of the normal premium would suffice to cover workmen's compensation claims only if the employer's premises were properly engineered for safe working conditions and the adjustment of claims which actually arose were handled efficiently and conservatively.

11. The plaintiff's function as a service organization was of prime importance to the successful operation of excess aggregate compensation insurance, both from the standpoint of the employer and from the standpoint of the underwriters.

12. The plaintiff and defendant began a business relationship in the month of June 1943, which continued until February 1, 1949. This relationship was initiated by a meeting in Louisville, Ky., between the plaintiff and Kenneth B. S. Robertson, President of the defendant corporation at that time.

13. Out of this initial meeting, grew the authority of the plaintiff to service excess aggregate compensation insurance policies for Lloyds underwriters and an understanding in regard to portion of the premium plaintiff should receive for such servicing.

14. The business relationship thus begun between the plaintiff and defendant contemplated that the defendant would be the broker binding the underwriters at Lloyds, London, England, on the risks which the plaintiff produced.

15. Dewey Daniel is a citizen of Kentucky and a resident of Hazard, Perry County, where he is engaged in the business of a general insurance agent for many different insurance firms.

16. Dewey Daniel began a business relationship with plaintiff in the month of June 1942, at which time the plaintiff introduced Dewey Daniel to the features of excess aggregate compensation insurance necessary for well advised "pro-

ducing" of risks and indicated the percent of normal premium payable to the producer. At this time, Dewey Daniel became licensed as an agent and broker for Lloyds of London.

17. The defendant customarily allowed the producer of excess aggregate compensation risks 5% of the normal premium.

18. The plaintiff, from June 1943, until August 1948, consented to the payment to Dewey Daniel of 17% of 30% of normal premium as compensation for producing excess aggregate risks, which was 5.1% of normal premium. The .1% difference between 5% or normal premium and the amount allowed to Dewey Daniel by plaintiff was taken from the share the plaintiff got from normal premium, and did not affect the share going to the defendant.

19. In August 1948, the defendant began to allow Dewey Daniel 7½% of the normal premium on risks produced by Dewey Daniel, the additional 2.4% portion of the premium being deducted from the share plaintiff had previously been receiving on such risks.

20. Both Dewey Daniel and the plaintiff "produced" substantial numbers of risks for excess aggregate compensation insurance covered through the defendant and Lloyds of London.

21. M. B. Fields was employed by the plaintiff in June 1942 as a claims adjuster and Hazard, Kentucky, office manager for plaintiff's firm. M. B. Fields retained this status until February 1, 1949, when his employment terminated.

22. In August 1943, a complaint was filed with the Kentucky Insurance Department by the Bituminous Casualty Insurance Company alleging that underwriters at Lloyds of London, through the defendant, were doing business in both the fire and casualty fields in Kentucky.

23. As a result of this complaint and hearing which followed it, an agreed order was issued by, the Kentucky Insurance Department, in which the defendant, and through it, the plaintiff Dewey Daniel, and M. B. Fields agreed not to write excess aggregate compensation insurance for risks which had not been self insured for at least two years prior to acceptance. This agreement expired on February 1, 1949.

24. The plaintiff continued to "produce" excess aggregrate insurance risks after the execution of the above agreed order, but thereafter, when the risk in question had not been self insured for two years prior to acceptance, the policy was written through Seaboard Surety Company.

25. Policies written by the plaintiff through the Seaboard Surety Company were contracts of reinsurance and all risks so covered for two or more years were eligible under the agreed order of the Kentucky Insurance Commission for coverage by underwriters at Lloyds of London through the defendant. The plaintiff serviced all these policies as well.

26. Despite the requests of the defendant, and Dewey Daniel, the plaintiff refused at all times to cover risks under policies with the defendant where those risks had become eligible for such coverage by virtue of previous reinsurance through the Seaboard Surety Company.

27. The plaintiff received a greater share of the excess aggregate compensation insurance premiums when such insurance was written with the Seaboard Surety Company than when it was written with the defendant.

28. The plaintiff made frequent threats to the defendant and its officers to write all excess aggregate compensation insurance through the Seaboard Surety Company unless he received a greater share of the premiums on such insurance when written with the defendant.

29. The plaintiff never agreed to place any proportion of the new insurance he "produced" with the defendant company and his conduct at all times indicated that he considered himself free to place such insurance with whatever broker he desired.

30. At the Hazard, Kentucky office of the plaintiff, all office supplies and files, as well as other equipment were bought and kept in the plaintiff's name.

31. Included within this category of office material were certain claim folders marked with the plaintiff's firm name and containing ruled lines denoting the nature of the claim and a description thereof. It was customary for the plaintiff to keep all matters relating to compensation claims from insured companies' employees in these folders.

32. Possession of these claims folders and the materials they contained was essential to the proper servicing of all excess aggregate compensation risks to which such material related and the "selling" of such risks upon the expiration of policies then in effect was far simpler for the possessor of such information than for anyone not in such possession.

33. There were no special agreements or understanding by any one that the claims folders and other pertinent office materials at the plaintiff's Hazard, Kentucky office were other than solely the property of the plaintiff for his use as he wished.

34. On January 28, 1949, without notification to the plaintiff, M. B. Fields and Dewey Daniel, by pre-arranged agreement, with the defendant, removed claims folders and their contents from the plaintiff's Hazard, Kentucky office and placed them in another office rented by them in the name of the Kentucky Insurance Service Agency.

35. The Kentucky Insurance Service Agency was formed by Dewey Daniel and the defendant, in January 1949, to take over the servicing of all excess aggregate compensation insurance previously handled by the plaintiff, and on or about February 1, 1949, all such risks were notified of the change in service organizations and their policies were amended by an endorsement to that effect.

36. On or about February 1, 1949, M. B. Fields resigned from the employ of the plaintiff's Hazard, Kentucky office and took a similar position with the Kentucky Insurance Service Agency.

37. The Kentucky Insurance Service Agency has at all times refused to return to the plaintiff the claims folders and information removed from his Hazard, Kentucky office and retained up until the time of this suit.

38. The defendant has offered to pay to the plaintiff the proportion of excess aggregate compensation insurance premiums collected on policies on which the plaintiff was named service organization or the producer at the percentage rate of division existing in practice immediately before February 1, 1949, and pursuant thereto has tendered an accounting showing the sums thus owed.

39. The plaintiff, though challenging this accounting as incomplete and inconclusive, has been unable to demonstrate any inaccuracy contained therein, while the defendant has shown it to be the customary account rendered in the regular course of its business. The plaintiff has failed to raise sufficient doubt in the Court's mind to justify further account procedures.

40. The defendant, through its officers and representatives has frequently visited the State of Kentucky during all the years covered by the actions herein for the specific purpose of soliciting and servicing excess aggregate compensation insurance business and matters related thereto.

41. In April 1951, the then President of the defendant, George Wilson, was in Lexington, Kentucky, pursuant to the business of the defendant in regard to the renewal of excess aggregate compensation insurance policies with the Marlow Coal Company group of bituminous coal mines. At this time, the plaintiff had the defendant served with the summons for this action through this same George Wilson.

42. Under the business relationship between the plaintiff and the defendant, it was contemplated that the servicing of excess aggregate compensation insurance might require the performance by the

plaintiff of some or all of his functions thereunder in any of the counties within the State of Kentucky, and it was' further contemplated that much of such servicing work would be done in Jefferson County, Kentucky.

43. Leland M. Mahan received an assignment of all rights and interests of all his former partners in Underwriters Safety & Claims on or before 1950.

### Conclusions of Law

I. The defendant's motion to dismiss the complaint or in the alternative to quash the summons because the defendant was not doing business in Kentucky and because the venue of the action was not in Jefferson County, Kentucky, is overruled.

The working arrangement between Mahan and Kenneth B. S. Robertson, Ltd., was made as the result of Mr. Robertson's visit to Louisville and the negotiations had there.

■ The forms and supplies used in carrying on the business, which were furnished by the defendant, were sent to Mahan's Louisville office. The venue of this action was therefore in the Jefferson Circuit Court. The evidence in the case clearly shows that the defendant was doing business in Kentucky.

■ Requiring the defendant to litigate a disputed issue arising out of transactions occurring in a foreign state, does not offend "traditional notions of fair play and substantial justice", where the corporation does not engage in isolated or short-lived transactions, creates continuing obligations and follows systematically a pattern of business. International Shoe Company v. State of Washington, Office of Unemployment Compensation and Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; Travelers Health Ass'n v. Com. of Virginia ex rel. State Corp. Comm., 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154; International Harvester Company v. Commonwealth of Kentucky, 147 Ky. 655, 145 S.W. 393, and Williams v. Bruce's Juices, D.C.W.D.Ky., 35 F. Supp. 847.

II. It was shown by the evidence that at the time of the trial of this action Kenneth B. S. Robertson was a person of unsound mind. Upon this ground, defendant contended that Mahan was prohibited by Section 421.210(2) Kentucky Revised Statutes (formerly Section 606(2) Kentucky Civil Code of Practice) from testifying as to verbal conversations with Robertson, which Mahan contended constituted the contract between Mahan and the defendant. The statute relied upon is:

" * * * no person shall testify for himself concerning any verbal statement of, or any transaction with, or any act done or omitted to be done * * * by one who is of unsound mind or dead when the testimony is offered to be given except for the purpose, and to the extent, of affecting one who is living, and who, when over fourteen years of age and of sound mind, heard such statement, or was present when such transaction took place * * * unless * * *

"(b) The person of unsound mind shall, when of sound mind, have testified against such person, with reference thereto * * *."

At the trial, objection upon the same ground was made to the introduction of letters to and from Mahan to and from Robertson. Many of the letters were admitted because the Court was of opinion that they were shown to have been written by Robertson and received by defendant corporation in the regular course of business. Section 1732 of Title 28 U.S.C.A. provides:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regu-

lar course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business', as used in this section, includes business, profession, occupation, and calling of every kind."

Some conversations between Robertson and Mahan, testified about by Mahan, occurred in the presence of Mr. Wilson, an executive officer of the defendant. The Court sustained defendant's objection to so much of Mahan's testimony as detailed conversations with Robertson when not had in the presence of other executive officers of defendant. Testimony by Mahan as to conversations with Robertson in the presence of other officers of the defendant corporation was admitted. The letters shown to have been written in the regular course of business were admitted. The Court adheres now to these rulings.

It is further concluded that the statement in Robertson's affidavit, filed in support of defendant's motion to dismiss, did not remove the bar of the statute which prohibited testimony by Mahan as to his conversations and transactions with Kenneth B. S. Robertson except in the presence of some other official of the defendant.

III. The final and vital question in the case is whether there was in effect February 1, 1949, such a binding contract between Mahan and defendant, the breach or termination of which entitles Mahan to damages.

Mahan stated the agreement with defendant to have been in substance,

"* * * that all business that I developed either myself or through any agency that I had any connec-tion with was supposed to be Mr. Robertson's business, and that all service, whether I developed it or Kenneth B. S. Robertson developed it, was my business, so long as either of us did business in Kentucky."

In the letters and correspondence comprising many exhibits read into the evidence in this case, there is no mention of the alleged contract or working arrangement being for any definite period of time and no mention that it should continue so long as either plaintiff or defendant continued to do business in Kentucky.

There are many references in the correspondence, extending over a period of seven years, to the percentage of the premium that the various parties were to receive, but no reference to any understanding that the contract was to continue for any period of time. Opposed to plaintiff's contention that there was a binding agreement for an extended period of time, are many expressions in Mahan's letters, particularly to Dewey Daniel.

In a letter of March 16, 1948, he wrote Daniel, in part:

"My appreciation for what Robbie (referring to Kenneth B. F. Robertson personally) has done for us in obtaining our first markets is so great that as long as he is living I would never consider doing business with Lloyd's other than through his office. * * * Frankly it would be impossible to do business with Wilson after Robbie is gone. * * * If anything should ever happen to Robbie, it is my thought that the wisest thing to do would be for you to make a direct contact with Underwriters and obtain the commission and contingency Robbie now gets for we certainly have no obligation to any one in Robbie's office except Robbie himself."

Three days later, he wrote Daniel:

"It has been necessary on numerous occasions for me to become extremely insistent with both Robert-

son and Seaboard in order to get them to accept on the rates and conditions we both knew were necessary in order to place the business. Ofttimes, I have been forced to advise them that if they would not accept, we would not only give that particular risk to the other company, but they would be short-circuited on future business. I just want to point out that the factor that has let us do as much as we have been able to in furnishing excess aggregate coverage on the basis that you require has been to keep both companies fighting for the business and placing one against the other."

It can not be doubted that Mahan did not at that time have in mind any mutually binding contract that would or did prevent him from short-circuiting from defendant the current of business from him or "any agency with which he had any connection." If he had such a right, the Company had the same right. The Company exercised this right when it canceled their arrangement February 1, 1949.

It is concluded that there existed between Mahan and defendant a working arrangement, which was terminable by either party at any time.

To recover damages for a breach of the contract contended for by Mahan, it was incumbent upon him to show an agreement for a definite period of time. Reciprocal obligations on the part of the parties and a definite period of time were essentials, and the evidence does not measure up to this requirement. Clark v. Cincinnati, N. O. & T. P. Ry. Co., 258 Ky. 197, 79 S.W.2d 704; Dysart v. Dawkins Log & Mill Co., 222 Ky. 415, 300 S.W. 906.

Considerable space is consumed in defendant's brief in arguing that the contract contended for by Mahan would be unforceable because of the Statute of Frauds. K.R.S. 371.010, in its pertinent parts here, provides:

"No action shall be brought to charge any person: * * *

"(7) Upon any agreement that is not to be performed within one year from the making thereof; * * * unless the promise, contract, agreement, representation, assurance or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent."

It is defendant's contention that although the evidence may show that a contract could be performed or completed within a year and is therefore not within the Statute of Frauds, that there is a well recognized exception to this rule to the effect that where a contract in which the contracting parties contemplate an extension for more than a year, the contract is within the Statute, citing Frankfort & Cincinnati Ry. Co. v. Jackson, 153 Ky. 534, 156 S.W. 103; Kentucky Utilities Company v. Hurst, 207 Ky. 448, 269 S.W. 525 and King v. McMillan, 293 Ky. 399, 169 S.W.2d 10. Having concluded, however, that there was no binding contract between Mahan and defendant for any definite period of time, it is not necessary for the applicability of the Statute of Frauds to be determined, it being sufficient that the Court has concluded that there was a working arrangement, varied from time to time by mutual agreement between plaintiff and defendant, but that there never was a valid contract which prevented either party from terminating the contract without subjecting himself to damages.

### Conclusion

It is therefore concluded that in Action 2109, wherein plaintiff seeks an accounting and in which the defendants admits indebtedness to plaintiff in the sum of $686, that the plaintiff have judgment for that amount. That in Action 2108, seeking damages for breach of the alleged contract, plaintiff's complaint be dismissed.

The cases having been heard together, the Court is of opinion that each of the parties hereto should pay one-half of the costs incurred in both cases.